forth, I reverse said decision and hereby adjudge and direct a patent to issue to the applicant upon his amended specification as prayed.

[See Case No. 6,260.]

## Case No. 6,257.

### In re HAYDEN.

[7 N. B. R. 192.] [1]

District Court, S. D. New York.   March 13, 1872.

BANKRUPTCY — RECEIPT OF MONEY AFTER FILING OF PETITION AND SERVICE OF INJUNCTION—CONTEMPT.

1. A bankrupt, who receives money from his debtor after the filing of a petition in bankruptcy and service on him of the usual injunction is guilty of contempt, but where he afterwards turns over to the assignee all his assets, the contempt is purged, even though he may have spent part of the money thus collected. The estate loses nothing, because payments made to the bankrupt by his debtor after the filing of the petition, are invalid as against the assignee.

2. Motion to punish the bankrupt for contempt, for violating injunction, denied.

[In bankruptcy. In the matter of J. P. Hayden.]

Putney & Adams, for the motion.
A. A. Redfield, opposed.

BLATCHFORD, District Judge. There was undoubtedly a violation of the injunction committed by the bankrupt, but on the whole evidence I cannot say that it was of such a wilful character that I ought to visit it with punishment, either personal or pecuniary. The payments made to the bankrupt by his debtors after the filing of the petition in bankruptcy were invalid as against the assignee. The assignee has, therefore, lost nothing. It is shown that the bankrupt has turned over everything he has to the assignee, and that he has no property or money. I by no means mean to hold that it is lawful for a debtor proceeded against in involuntary bankruptcy, and enjoined in the usual form under section forty, to spend money even for the purposes for which the debtor in this case spent the money which he collected after the injunction was served on him. There was a contempt in this case, but it is satisfactorily purged. The motion is denied.

## Case No. 6,257a.

### HAYDEN v. ANDROSCOGGIN MILLS.
### HAYDEN v. BATES MANUF'G CO.

[See 1 Fed. 93.]

HAYDEN (The COLONEL HOWARD v.).
See Case No. 3,026.

[1] [Reprinted by permission.]
11FED.CAS.—57

## Case No. 6,258.

### HAYDEN et al. v. The C. W. COCHRANE.

[3 Woods, 304.] [1]

Circuit Court, E. D. Texas.   May Term, 1879.

#### SALVAGE—BASIS OF AWARD.

1. Where a bark laden with cotton, and anchored outside the bar, took fire, and as the only means of saving ship and cargo she was towed by salvors into shallow water and filled and sunk, and her hull and cargo were afterwards sold in that condition: Held, that the sum which they brought at the sale was the measure of the salved property, and that salvage should be allowed on that basis.

2. The amount allowed in the case to the salvors stated.

[Appeal from the district court of the United States for the Eastern district of Texas.

[This was a libel by John H. Hayden and others against the bark C. W. Cochrane and cargo.] On January 9, 1879, the bark C. W. Cochrane was lying off the bar at Galveston, in about six fathoms and a half of water, engaged in taking in a cargo of cotton from lighters. The bark was worth $70,000, and had taken aboard 2,600 bales of cotton, worth $104,000. About one o'clock p. m., of the day just mentioned, the cotton stowed in the lower forward hold was discovered to be on fire, in a part of the ship which was inaccessible. The master was absent, but the first officer who was in charge of the vessel, closed all vents so as to keep down the fire, and set signals of distress. When the fire was first discovered, the first officer had with him six men of the crew and five stevedores who had been engaged in stowing the cargo. Several steam tugs and lighters answered the signal, and came to the assistance of the bark. These were steam-tugs Buckthorn, Joy, and the steam-lighter Ella Knight. They all tried to subdue the fire by pumping water into the hold of the bark. About 10 p. m. the master of the bark arrived. On consultation, the master decided that the only way to save the bark and cargo from total loss was to tow her into 20-feet water and fill her. This was done. The lighter Ella Knight and the tug Joy towed the bark shorewards to a place where there was about 20 feet of water and a mud bottom, where she was anchored. The steam-tugs and the steam-lighter Ella Knight resumed the work of pumping water into the hold of the bark.

On the morning of January 10, the day after the bark had been anchored as aforesaid, the weather became unfavorable, the wind sprung up from the southeast, causing a heavy sea, which grew worse all day and the following night, rendering it extremely hazardous for the vessels to lie alongside the bark on account of the rolling and pitching of the craft, and their concussion with each other. Another source of danger to the vessel and the men employed about the bark,

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]